**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|                              |   |                                |
|------------------------------|---|--------------------------------|
|                              | : | Chapter 7                      |
| Grimm Brothers Realty Co.,   | : |                                |
| Debtor.                      | : | Bankruptcy No. 17-13697-MDC    |

# <u>MEMORANDUM</u>

BY: MAGDELINE D. COLEMAN, CHIEF UNITED STATES BANKRUPTCY JUDGE

## I.    INTRODUCTION

Before the Court for disposition are two separate matters in the bankruptcy case of
Grimm Brothers Realty Co. (the "Debtor"). First, Gary Grimm ("Mr. Grimm"), the Debtor's
former operations manager, has filed the *Expedited Motion for the Court to Appoint Debtor to
Manage Business Operations for Debtor and for Chapter 7 Trustee to Return Funds Garnished
from Debtor's Accounts, 337 East Marshall St., Norristown, Pennsylvania* (the "Business
Management Motion").[1] By the Business Management Motion, Mr. Grimm seeks an order
appointing himself to manage the Debtor's business and financial affairs and directing Terry P.
Dershaw (the "Trustee"), as the chapter 7 Trustee for the Debtor's estate, to turn over $4,920.93
to Mr. Grimm, which funds the Trustee garnished from the Debtor's operating account but which
Mr. Grimm asserts are attributable to non-Debtor property.

Second, the Trustee has filed the *Motion of Terry P. Dershaw, as Chapter 7 Trustee, for
an Order Pursuant to 11 U.S.C. §554 and Federal Rule of Bankruptcy Procedure 6007
Authorizing Abandonment of Certain Estate Property* (the "Abandonment Motion," and together

---

[1] Bankr. Docket No. 376.

with the Business Management Motion, the "Motions").[2]  By the Abandonment Motion, the

Trustee seeks authority, pursuant to §554 of the Bankruptcy Code, 11 U.S.C. §§101, *et seq*., to

abandon four separate parcels of real estate the Debtor owns (together, the "Properties") as well

as the rents derived therefrom that post-date July 1, 2020 (the "Rents").

     For the reasons set forth below, the Court will deny both the Business Management

Motion and the Abandonment Motion.  The Court will also issue an Order directing the Trustee

and Mr. Grimm to take and refrain from taking certain actions in order to promote the Trustee's

fulfillment of his obligations to the Debtor's estate and its creditors.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

### A.    Conversion of the Debtor's Case to Chapter 7 and Appointment of the Trustee

     The Debtor filed a voluntary bankruptcy petition under chapter 11 of the Bankruptcy

Code on May 26, 2017.[3]  Nearly three years later, on May 15, 2020, the Court entered an order

converting the Debtor's bankruptcy case to a case under chapter 7 of the Bankruptcy Code.[4]  On

May 18, 2020, the Trustee was appointed as interim trustee of the Debtor's bankruptcy estate

pursuant to §701 of the Bankruptcy Code.[5]

     On June 15, 2020, the Trustee filed a motion to retain Star Real Estate Group, Inc.

("Star") as real estate broker for the Trustee, in order to assist the Trustee in marketing the

Debtor's Properties for sale (the "Star Retention Motion").[6]  The Listing Contract between the

Trustee and Star, attached as Exhibit A to the Star Retention Motion, identified those Properties

---

[2] Bankr. Docket No. 390.

[3] Bankr. Docket No. 1.

[4] Bankr. Docket No. 312.

[5] Bankr. Docket No. 315.

[6] Bankr. Docket No. 359.

as the following, each located in Norristown, Pennsylvania: (i) 837 Swede Street, (ii) 901 Swede

Street, (iii) 636 Cherry Street, and (iv) 857 Cherry Street.  On July 23, 2020, the Court entered an

order authorizing the Trustee to retain Star.[7]

> **B.    Mr. Grimm's Filing of the Business Management Motion**

Shortly after the Trustee filed the Star Retention Motion, on June 26, 2020, Mr. Grimm

filed the Business Management Motion.  Mr. Grimm asserted in the Business Management

Motion that the Debtor "performs daily maintenance to the properties, rents vacant units, files

complaints against nonpaying tenants, pays financial obligations, and maintains business records

as required by law, all of which requires employees with supervision provided by operations

manager [Mr. Grimm]."[8]  In essence, Mr. Grimm represented that he should be appointed to

continue managing the Debtor's operations notwithstanding the conversion of the Debtor's case

to a chapter 7 liquidation and the appointment of the Trustee.  Mr. Grimm also asserted that

following his appointment, the Trustee garnished funds in the Debtor's operating account in the

amount of $6,460.58 as well as funds in the Debtor's tenant security deposit account in the

amount of $16,811.36.[9]  Mr. Grimm represented that "[s]ome of the income and security

deposit" garnished by the Trustee was attributable to a property managed by the Debtor but

owned by Mr. Grimm personally.  Mr. Grimm consequently seeks the return of $4,920.93, which

he asserts is the amount attributable to his property.[10]  Mr. Grimm also asserted that he

---

[7] Bankr. Docket No. 414.

[8] Bankr. Docket No. 376, at introductory paragraph.

[9] *Id.* at ¶13.

[10] *Id.* at ¶¶15 to 17.

"contributed $3,500 of his personal funds to pay for municipal/county taxes for 2020."[11] Although the relief sought by the Business Management Motion does not include a request for repayment of this amount, and Mr. Grimm did not submit a proposed order granting the Business Management Motion, the Court will assume from his Motion that he also seeks repayment of $3,500 he allegedly paid on behalf of the Debtor for municipal and county taxes.

On June 29, 2020, the Trustee filed an objection to the Business Management Motion (the "Business Management Objection").[12]  The Trustee argued that the conversion of the Debtor's case to chapter 7 divested the Debtor of the right to continue the operation of its business and vested the Debtor's assets in the Trustee.[13]  In responding to Mr. Grimm's assertion that funds garnished from the Debtor's bank accounts should be returned to Mr. Grimm, the Trustee responded that pursuant to §704(a)(1) of the Bankruptcy Code, he was charged upon his appointment with the duty to take possession of estate assets, including cash in the Debtor's bank accounts.[14]  The Trustee also stated that, at least as of the date of the objection, he had not determined whether to operate the Debtor's business or to abandon its real properties, which decision he asserts is left to his discretion, but that operating the business would require entry of an order by the Court pursuant to §721 of the Bankruptcy Code.[15]

---

[11] Exhibit C to the Business Management Motion consists of what appear to be transaction summaries for the taxes paid, which reflect that they were paid by paper check on June 17, 2020, which post-dates the date on which the Debtor's case was converted to chapter 7.

[12] Bankr. Docket No. 378.

[13] *Id.* at ¶6.

[14] *Id.* at ¶8.

[15] *Id.* at ¶9.

### C.    The Trustee's Filing of the Abandonment Motion

On July 7, 2020, the Trustee filed the Abandonment Motion.  In the Abandonment Motion, the Trustee represented that he "retained a real estate brokerage firm to evaluate the present market value of the Debtor's real properties, giving effect to the physical condition and costs of operating those properties, the status of tenant leases or other occupancy arrangements, general market conditions in the area in which the properties are located, and the amount and reliability of monthly income based on existing leases."[16]  The Trustee further represented that his review of the Debtor's schedules, statement of financial affairs, and monthly operating reports reflected that the Debtor's four Properties were subject to various liens for unpaid federal, state and municipal taxes, that there were leases of residential units at each of the Properties (the "Leases"), and that during the Debtor's chapter 11 case it was only able to operate its business on a break-even basis at best.[17]  The Trustee, based on the opinion of Star as his real estate broker, concluded that the sale of one or more of the Properties would require considerable time and effort, and an extended marketing period would require the Trustee to operate the Debtor's business without assurance that a sale would be consummated or that the business would generate positive cash flow.[18]  The Trustee therefore asserted it was an exercise of his reasoned business judgment to abandon the estate's interest in the Properties, the Leases, and the Rents derived from the Leases from and after July 1, 2020, pursuant to §554 of the Bankruptcy Code.[19]  The Trustee argued that "the value of the Properties, the Leases and the

---

[16] Bankr. Docket No. 390, at ¶5.

[17] *Id.* at ¶¶7 to 9.

[18] *Id.* at ¶10.

[19] *Id.* at ¶11.  The Trustee stated in the Abandonment Motion that he was not seeking to abandon cash, causes of action, and other assets, including cash obtained from the Debtor.

Rents is outweighed by the cost, uncertainty and potential liability resulting from the Trustee's operation of the Debtor's business and the risk that such operations would actually diminish, rather than enhance, amounts available to creditors."[20]  Finally, the Trustee asserted that repeated requests to Mr. Grimm to provide proof of the Debtor's general liability and other insurance information had been unsuccessful.[21]

On August 14, 2020, the Debtor responded to the Abandonment Motion.[22]  The Debtor denied that the Trustee made a reasonable effort to determine the value of the Debtor's assets or to market them and denied that any act or omission by Mr. Grimm interfered with the Trustee's ability to do so.[23]  The Debtor also represented that Mr. Grimm had procured an agreement of sale for one of the four Properties and an offer for a second property through the Debtor's own broker.[24]  Specifically, the Debtor alleged that it had procured an agreement of sale for the Property located at 636 Cherry Street in the amount of $100,000, and an offer to purchase 857 Cherry Street in the amount of $225,000.[25]  The Debtor also stated that it expected to receive an offer on the Property located at 901 Swede Street within a week.[26]  The Debtor asserted that none of the Properties were subject to mortgages, notwithstanding that the Montgomery County Recorder of Deeds showed numerous unsatisfied mortgages for three of the Properties.[27]

---

[20] *Id.* at ¶16.

[21] *Id.*

[22] Bankr. Docket No. 432.

[23] *Id.* at ¶4.

[24] *Id.* at ¶10.

[25] *Id.* at ¶¶45, 46.

[26] *Id.* at ¶48.

[27] *Id.* at ¶¶21 to 38, discussing mortgages with respect to 857 Cherry Street, 636 Cherry Street, and 901 Swede Street.

According to the Debtor, if the sales of the Properties at 636 and 857 Cherry Street close, and assuming closing costs of 15%, the sales would net $276,250.[28]  On the other hand, according to the Debtor, after excluding any claims that Mr. Grimm or his chapter 13 bankruptcy estate may assert, all claims against the Debtor's chapter 7 estate total $264,060.28, of which $149,013.10 is secured, without accounting for objections the Debtor may have to certain of those claims.[29]  Therefore, the Debtor argued, the sale proceeds would pay 100% of the claims currently asserted against the Debtor's estate, with surplus that, when added to the Trustee's cash-on-hand, would be sufficient to allow recovery on claims by Mr. Grimm or his chapter 13 estate.[30]  The Debtor therefore argued that it was critical to have the Properties administered by the Trustee and sold pursuant to §363 of the Bankruptcy Code, rather than subject to foreclosure outside of bankruptcy.[31]

**D.    The Hearing on the Business Management Motion and the Abandonment Motion**

On October 7, 2020, the Court held a hearing (the "Hearing") on the Business Management Motion and the Abandonment Motion.  The Trustee testified on behalf of himself. Mr. Grimm testified on behalf of the Debtor, as did George Korkus ("Mr. Korkus"), a real estate broker assisting the Debtor with the marketing and sale of the Properties.

**1.    The Trustee's Testimony**

With respect to the Debtor's Properties, the Trustee testified that he retained Richard Astrella ("Mr. Astrella") of Star to evaluate the Properties for sale.[32]  In addition to

---

[28] *Id.* at ¶50.

[29] *Id.* at ¶¶41 to 43; ¶¶54, 55.

[30] *Id.* at ¶¶51 to 52.

[31] *Id.* at ¶¶56, 57.

[32] Hearing Recording 1:29 p.m.

having Star evaluate the Properties, the Trustee was referred to a prospective purchaser known to his counsel, who ultimately was not interested in the Properties.[33]  The Trustee testified that the only offers he had received to purchase any of the Properties were three that Mr. Grimm had obtained, although only two were pursuant to what the Trustee considered to be an agreement of sale.[34]  The Trustee conditioned his review of those offers on receipt of certain additional information, including a HUD-1 settlement sheet because he believed that there may have been judgments against the Debtor that needed to be satisfied, in addition to substantial tax liabilities.[35]  The Trustee gave the Debtor and Mr. Grimm until October 5, 2020 to produce that information, but did not receive it.[36]

The Trustee contended that with secured claims in the Debtor's case exceeding $228,000, as reflected on the Claims Register, he believed would need to net at least that amount, in addition to his own fees, in order to provide a recovery to unsecured creditors.[37]  The Trustee testified that he did not know the physical conditions of any of the Properties, but one of his conditions for accepting any offer for a Property was that the sale be "as is, where is" in order to have certainty regarding the net proceeds the estate would realize.[38]  The Trustee testified as to his understanding that the Debtor had purchased the Properties for relatively little amounts, such that any depreciation that could be claimed against the cost basis for tax purposes had been expended with respect to the Properties, and there would therefore be a potentially a large capital

---

[33] *Id.* at 1:30 p.m.

[34] *Id.* at 1:31 p.m.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 1:31 to 1:33 p.m.

[38] *Id.* at 1:37 to 1:38 p.m.

gains tax liability upon the Properties' sale.[39]  This liability would be in addition to any other

costs of sale the Debtor's chapter 7 estate would incur.[40]

      The Trustee testified that in addition to his evaluation of the Properties for sale, he

also attempted to evaluate potentially avoidable transactions by the Debtor in an effort to

determine whether they might provide an alternate avenue of recovery for unsecured creditors

but was unable to conduct this evaluation because the Debtor's schedules and statements did not

reflect any pre-petition transfers to insider or non-insider parties.[41]

      The Trustee testified that after his appointment in May 2020, he sent letters to

tenants of the Properties requesting that Rent payments be sent to him directly, but as a result

received only six rent checks.[42]  He testified that to the best of his knowledge the rest of the Rent

payments were collected and held by Mr. Grimm.[43]  He also testified that Mr. Grimm had

continued to operate the Debtor's business since conversion, but wanted the Trustee to undertake

the burden of selling the Properties and the attendant costs.[44]

      On cross-examination, when asked whether he had obtained a value for the 636

Cherry Street Property from Mr. Astrella, the Trustee testified that Mr. Astrella reviewed the

Debtor's schedules regarding the Properties, but had concerns about their value and sale potential

in light of market conditions during the COVID-19 pandemic.[45]  The Trustee also testified, when

asked whether he had directed Star to sell any of the Properties, that he had provided Mr.

---

[39] *Id.* at 1:39 p.m.

[40] *Id.*

[41] *Id.* at 1:43 p.m.

[42] *Id.* at 1:46 p.m.

[43] *Id.* at 1:52 p.m.

[44] *Id.*

[45] *Id.* at 1:58 p.m.

Astrella with a list of the Properties but, given Mr. Astrella's concerns about market conditions, the Trustee did not think it was prudent to proceed with sales.[46]  The Trustee admitted that neither he nor any agent of his made any effort to inspect the Properties.[47]  The Trustee testified that when he determined that the offer Mr. Grimm obtained for the Property at 636 Cherry Street was inadequate, he did not ask Star to seek an acceptable deal with the prospective purchaser, but rather asked Mr. Grimm to do so.[48]

The Trustee admitted that he holds approximately $27,000 that was disgorged from the Debtor's prior counsel, as well as approximately $6,400 from the Debtor's bank account.[49]  When asked whether he could have used these funds to obtain the title searches he desired prior to deciding whether any proposed sales were advisable, the Trustee stated that he was not inclined to proceed with trying to sell the Properties given the inability of Mr. Grimm to obtain offers that met his conditions, as well as Mr. Grimm's interference with the collection of Rents for the Properties.[50]

When asked what he believed 857 Cherry Street was worth, he estimated it is worth between $200,000 to $250,000.[51]  When asked what he believed 837 Swede Street is worth, he estimated $300,000 to $350,000.[52]  When asked what he believed 901 Swede Street is worth, he estimated $150,000 to 200,000.[53]  When asked what he believed 636 Cherry Street was

---

[46] *Id.*

[47] *Id.* at 1:59 p.m.

[48] *Id.* at 2:00 p.m.

[49] *Id.* at 2:03 p.m.

[50] *Id.* at 2:04 p.m., 2:10 to 2:11 p.m.

[51] *Id.* at 2:07 p.m.

[52] *Id.*

[53] *Id.* at 2:08 p.m.

worth, he estimated it is worth less than $100,000.[54]  He believed these estimates were based on

the Debtor's schedules completed in 2017, but could not say whether they had appreciated.[55]

However, he also testified on re-direct that it was possible that the Properties were worth less

than the costs that would need to be paid in connection with marketing and selling the

Properties.[56]

### 2.      Mr. Grimm's Testimony

In contrast to the Trustee's testimony regarding the value of the Properties, Mr.

Grimm testified that 901 Swede Street is worth $275,000, based on the rental income obtained

from the Property.[57]  This amount is more than the amount that was scheduled for the Property in

2017, which Mr. Grimm attributed to an increase in the rent received since 2017.[58]  Mr. Grimm

estimated that 837 Swede Street is worth $350,000.[59]  Mr. Grimm estimated that 857 Cherry

Street is worth $300,000.[60]  Mr. Grimm estimated that 636 Swede Street is worth $100,000.[61]

Mr. Grimm testified that Mr. Korkus obtained offers to purchase 857 Cherry Street for $260,000

and 901 Swede Street for $200,000, the latter of which Mr. Grimm viewed as not reflective of

the Property's value.[62]  Mr. Grimm testified that there are recorded liens against the Property in

the Montgomery County Recorder of Deeds that have been satisfied and should have been

---

[54] *Id.*

[55] *Id.*

[56] *Id.* at 2:12 to 2:13 p.m.

[57] *Id.* at 2:21 p.m.

[58] *Id.* at 2:22 p.m.

[59] *Id.* at 2:23 p.m.

[60] *Id.*

[61] *Id.* at 2:24 p.m.

[62] *Id.* at 2:25 p.m.

released.[63]  Mr. Grimm further testified that there are no undisclosed judgment liens against the Properties.[64]  With respect to Rents for the Properties, Mr. Grimm testified on direct examination that he currently holds Rent checks for October totaling approximately $4,200, which he is holding pending further direction from the Court.[65]

Mr. Grimm testified regarding the status of claims against the Debtor's estate. According to Mr. Grimm, the Claims Register, reflecting approximately $422,000 in Claims against the Debtor, is outdated because (i) Claim #22, in the amount of $14,700, should not be included because it mistakenly was placed on the Debtor's Claim Register, but was asserted against a debtor named Vascular Access Centers, L.P.; (ii) Claim #15, in the amount of approximately $71,000, has been previously disallowed in its entirety by an order of the Court.[66] Mr. Grimm also testified that there is an additional secured claim against the Debtor held by the Pennsylvania Workers' Compensation Commission, in the amount of approximately $20,000, that does not appear on the Claims Register but which the Debtor owes.[67]  Mr. Grimm also testified that he believes the Internal Revenue Service's claim, in the amount of approximately $90,000, should be disallowed entirely.[68]

Mr. Grimm admitted on cross-examination that he does not have any official role with the Debtor but has continued to collect Rent for the Properties.[69]  Mr. Grimm asserted that he was not initially aware he was not permitted to continue operating the Debtor's business after

---

[63] *Id.* at 2:39 p.m.

[64] *Id.*

[65] *Id.* at 2:26 p.m.

[66] *Id.* at 2:32 p.m.

[67] *Id.* at 2:35 p.m.

[68] *Id.* at 2:37 to 2:38 p.m.

[69] *Id.* at 2:50 to 2:51 p.m.

the conversion, although he came to understand that at some point.[70] Mr. Grimm admitted that

he collected Rents from the Properties that were sent to him by tenants from June through

October 2020 and used the funds to pay the Debtor's obligations, asserting that he had asked the

Trustee to do so without success.[71]

Mr. Grimm asserted that he was unaware of any zoning issues that might inhibit

the sales of any Properties, notwithstanding Mr. Korkus's opinion that there is a need to reinstate

the Properties' zoning prior to any sale.[72] Mr. Grimm admitted that, although he believed that

the various liens that remain of record on certain of the Properties have been satisfied, such liens

would need to be removed prior to any sale in order to deliver clean title to the Buyer.[73] Mr.

Grimm acknowledged that while there were current offers to purchase two of the four Properties,

even assuming those Properties ultimately are sold, the Trustee would need to expend funds to

manage the two remaining Properties.[74] Mr. Grimm admitted that during the Debtor's chapter

11 case the Debtor was cash-flow negative.[75]

With respect to those two Properties that would remain in the estate, i.e., 636

Cherry Street and 837 Swede Street, Mr. Grimm testified that no Rent is being collected and

admitted that there are ongoing expenses that would need to be paid.[76] Mr. Grimm also

---

[70] *Id.* at 2:53 p.m.

[71] *Id.* at 2:53 to 3:00 p.m.

[72] *Id.* at 3:08 p.m.

[73] *Id.* at 3:10 p.m.

[74] *Id.* at 3:19 p.m.

[75] *Id.* at 3:01 to 3:02 p.m.

[76] *Id.* at 3:21 p.m.

acknowledged that he could not know when an agreement of sale could be obtained for the 636

Cherry Street or 837 Swede Street Properties.[77]

### 3.    Mr. Korkus's Testimony

Mr. Korkus is a real estate broker who testified that he has been working with Mr.

Grimm to market and sell the Properties located at 901 Swede Street and 857 Cherry Street.[78]

Mr. Korkus testified that he has offers on both Properties.[79]  With respect to 857 Cherry Street,

Mr. Korkus estimated that he received an offer approximately one month prior to the Hearing for

$260,000.[80]  Mr. Korkus testified that he did not receive a deposit for the sale and would not

until all terms were finalized.[81]  Mr. Korkus testified that the agreement of sale for 857 Cherry

Street was initialed and signed by Mr. Grimm, and that only upon participating in the Hearing

did he come to understand the Trustee's role with respect to the Properties.[82]  Mr. Korkus

testified that the prospective purchaser wants to proceed with the sale, but is concerned that a

process with the Norristown government will be required to obtain licensing for the Property as a

multi-unit property.[83]  Mr. Korkus explained that the process for reapplying to have the 857

Swede Street Property zoned as a multi-unit property will require a number of months to

---

[77] *Id.* at 3:35 p.m.

[78] *Id.* at 3:27 p.m.

[79] *Id.* at 3:28 p.m.

[80] *Id.* at 3:29 p.m.

[81] *Id.* at 3:32 p.m.

[82] *Id.* at 3:27, 3:30 p.m.

[83] *Id.* at 3:29 p.m.

complete, as well as a $1,500 application fee.[84]  Mr. Korkus believed that the application will

ultimately be granted.[85]  Mr. Korkus still viewed the offer to purchase the Property as viable.[86]

With respect to the 901 Swede Street, Mr. Korkus testified that he had an offer to

purchase the Property for $200,000.[87]  The agreement of sale provided for a $10,000 deposit, but

the prospective purchaser had not yet made the deposit because the final terms of the agreement

had not yet been approved.[88]

Other than the zoning issue for the 857 Cherry Street Property, Mr. Korkus

testified that the Trustee has required that any sale be as-is, where-is, so both agreements would

need to be revised to reflect that.[89]  Mr. Korkus believed that both offers were reasonable, even if

"a bit more" could be sought.[90]

On cross-examination Mr. Korkus testified he had only recently learned that Mr.

Grimm does not have authority to negotiate the sale of any of the Debtor's Properties.[91]  Mr.

Korkus also acknowledged that both tentative agreements of sale are subject to mortgage

contingencies and inspection rights.[92]  Mr. Korkus agreed that the zoning issue with respect to

the 857 Cherry Street Property represents a contingency that would potentially require several

---

[84] *Id.* at 3:33 p.m.

[85] *Id.*

[86] *Id.* at 3:30 p.m.

[87] *Id.* at 3:31 p.m.

[88] *Id.* at 3:32 p.m.

[89] *Id.* at 3:35 p.m.

[90] *Id.* at 3:36 p.m.

[91] *Id.* at 3:37 p.m.

[92] *Id.*

months to navigate.[93]  Mr. Korkus considered both the prospective purchasers as "good buyers" that "could probably buy the properties."[94]

## III.    DISCUSSION

### A.    The Abandonment Motion Will Be Denied

Section 554(a) of the Bankruptcy Code provides that a trustee (or debtor-in-possession) may abandon estate property that is "burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. §554(a).  The purpose of allowing abandonment is to protect the estate from the burden of having to administer property that will not benefit unsecured creditors.  *In re Wilton Armetale, Inc.*, 618 B.R. 424, 2020 Bankr. LEXIS 2274, at *16 (Bankr. E.D. Pa. 2020) (*citing In re Paolella*, 79 B.R. 607, 609 (Bankr. E.D. Pa. 1987)).  In order to abandon property, however, "the bankruptcy trustee must demonstrate that he made: 1) a business judgment; 2) in good faith; 3) upon some reasonable basis; and 4) within the [trustee's] scope of authority."  *Id.* (internal citations omitted); *see also In re APP Winddown, LLC*, 2019 Bankr. LEXIS 3790, at *7 (Bankr. D. Del. Dec. 16, 2019).  A trustee is given wide discretion in whether to abandon property, and in deciding whether abandonment should be allowed, a court's role is not to second-guess the trustee, but rather to determine if the trustee made a reasonable decision.  *Id.* at *17; *see also In re Contract Research Solutions, Inc.,* 2013 Bankr. LEXIS 1784, at *11 (Bankr. D. Del. May 1, 2013) (in abandoning property under §554, the trustee "need only demonstrate that it has exercised sound business judgment in make the determination to abandon")).  With respect to the burden of proof, the Trustee bears the burden of persuasion. *Wilton Armetale, Inc.*, 2020 Bankr. LEXIS 2274, at *17*; see also Neville v. Harris*, 192 B.R.

---

[93] *Id.* at 3:39 p.m.

[94] *Id.* at 3:41 p.m.

825, 830 (Bankr. D.N.J. 1996).  However, in contesting abandonment the Debtor "bears a reciprocal burden to show some likely benefit to the estate."  *Wilton Armetale, Inc.*, 2020 Bankr. LEXIS 2274, at *17.

Here, even accounting for the discretion afforded to the Trustee, the Court finds that he has not met his burden in establishing that abandonment of the Properties, Leases, and Rents from and after July 1, 2020 is a reasonable exercise of his business judgment, at least at this stage of the Debtor's chapter 7 case.  The testimony at the Hearing from Mr. Grimm and Mr. Korkus suggests that there is a healthy market for the sale of at least some of the Properties.  Mr. Grimm and Mr. Korkus have secured offers, even if conditional, for the sale of two of the Properties. Mr. Korkus did not appear to believe that the Trustee's conditions for accepting those offers, including an as-is, where-is sale subject to increased deposits and free of other contingencies, would present a problem in moving forward with those potential sales.  Mr. Korkus also testified that he did not believe the zoning issues with respect to the Property located at 857 Swede Street would prevent the prospective purchaser from moving forward, even if addressing those issues would take some additional time and expense from the Trustee.  The prospective sale prices for the Properties at 857 Cherry Street and 901 Swede Street are significant in view of the claims against the Debtor's estate, and, based on the testimony at the Hearing and the claims on the Claims Register in the case, appear to be sufficient to afford recovery to unsecured creditors after the payment of secured claims.

The Court is unpersuaded that the Trustee's testimony supports his request to abandon the Properties.  Although the Trustee sought and received this Court's permission to retain Star as his real estate broker to evaluate the Properties, it does not appear that the Trustee and Star engaged in a fulsome evaluation of the Properties' sale potential prior to the Trustee's

17

determination that they are burdensome or of inconsequential value to the estate.  Neither the

Trustee nor Star had been to the Properties, and the Trustee's testimony suggests that other than

a review of the Debtor's schedules and some discussion with Mr. Astrella regarding anticipated

market conditions in light of the COVID-19 pandemic, the Trustee did not undertake to

determine the values of the Properties.  When asked to provide his estimate of the value of each

of the Properties, the Trustee gave values that were based on the Debtor's schedules, rather than

a canvassing of the market or analysis of current market conditions.  Indeed, the Trustee could

not answer whether he believed the Properties had appreciated since the schedules were prepared

in 2017.  Moreover, the values to which the Trustee testified totaled between $750,000 and

$900,000.  This is far from inconsequential value, and although there certainly will be costs and

effort expended to market and sell the properties (possibly including costs of ongoing

maintenance of the Properties), the Court does not believe such costs and efforts represent a

burden to the estate that warrants abandonment of the Properties in light of the potential value to

be obtained from their sale.

The Court appreciates the Trustee's concern that he possesses finite funds with which to

pay expenses associated with the Properties and administration of the Debtor's estate.  As

discussed below, however, in addition to cash currently on hand, the Trustee will have the

income stream of Rent due for the Properties occupied by tenants.  The prospect of two sales in

the somewhat-immediate future should also alleviate some of the concerns that there will be

insufficient funds for the Trustee to manage the Properties while marketing them for sale.  At

bottom, the Court believes the Properties hold sufficient value, and there is a sufficiently active

market for them, to offset any concerns the Trustee has at present regarding the costs that may be

incurred while marketing them.

The Court finds that the relief requested by the Abandonment Motion does not represent a reasonable exercise of the Trustee's business judgment and will therefore deny the Motion.

### B.      The Business Management Motion Will Be Denied

Section 704 of the Bankruptcy Code set forth the duties of a chapter 7 trustee.  Among those duties is the duty to "collect and reduce to money the property of the estate for which such trustee serves and close such estate as expeditiously as incompatible with the best interests of parties in interest."  11 U.S.C. §704(a)(1).  As such, under the Bankruptcy Code the Trustee has exclusive authority to administer and dispose of property of the Debtor's estate.  *Sikirica v. Harber (In re Harber)*, 553 B.R. 522, 527 (Bankr. W.D. Pa. 2016).

The Properties, and the Rents derived therefrom, are property of the Debtor's estate.  *Sternglass v. O'Toole (In re Leatherstocking Antiques, Inc.)*, 2013 U.S. Dist. LEXIS 141091, at *13 (S.D.N.Y. Sept. 30, 2013) (noting that it was beyond dispute that a chapter 7 debtor's rental properties and any income generated from the properties was property of the debtor's estate).  The Trustee is therefore charged with collecting the Rents for the benefit of the Debtor's estate.  Although prior to conversion this task was among Mr. Grimm's responsibilities in his role as the Debtor's operations manager, and at the Hearing he testified that he continued to do so after conversion, he no longer is responsible for collecting the Rents.  Nor is he responsible for ensuring satisfaction of the Debtor's obligations with respect to the Properties.  Those responsibilities are the Trustee's and the Trustee's alone, absent delegation to a duly authorized agent.  Notwithstanding Mr. Grimm's familiarity with the Properties, the Leases, and the Rents derived therefrom, he is without authority to exercise any possession or control over those assets.

There has been no showing that the Trustee is unable or unwilling to collect the Rents, satisfy the obligations of the Debtor, and otherwise administer the Debtor's estate consistent with

his duties under the Bankruptcy Code. Rather, the testimony at the Hearing was that upon his appointment, the Trustee reached out to the known tenants of the Properties and directed them to send all Rent payments directly to him. The Trustee further testified as to his understanding that, with the exception of six-monthly Rent payments, all post-conversion Rent payments had been given to Mr. Grimm. Mr. Grimm confirmed at the Hearing that he had received Rent payments at the Debtor's offices and had used the funds received to pay obligations of the Debtor. Mr. Grimm's possession and control of the Rent payments, as well as his unauthorized presence at and maintenance of the Properties, interferes with the Trustee's administration of the Debtor's estate. *See Sternglass*, 2013 U.S. Dist. LEXIS 141091, at *13-*14 (affirming the bankruptcy court's entry of injunctive relief in favor of the chapter 7 trustee where the debtor's owners had continued to collect and hold rent from the debtor's properties notwithstanding the chapter 7 trustee's repeated directives to turn such rent over to her).

As noted above, under the Bankruptcy Code the Trustee and the Trustee alone is authorized to collect and administer the Debtor's assets. The Trustee has not exhibited an unwillingness to exercise that authority. The Court therefore will not appoint Mr. Grimm to do so where the Bankruptcy Code rests that authority with the Trustee. The Business Management Motion will consequently be denied.[95]

## IV.    CONCLUSION

For the reasons set forth above, the Court will deny both the Abandonment Motion and the Business Management Motion. Furthermore, because the Motions and the testimony at the

---

[95] As noted *supra*, in the Business Management Motion Mr. Grimm (i) seeks the return of $4,920.93, which he alleged are funds garnished by the Trustee but attributable to a property owned by Mr. Grimm personally, and (ii) asserts that he contributed $3,500 of his personal funds to pay the Debtor's 2020 municipal/county tax obligation. However, the Court was presented with no evidence, or even argument, about these amounts at the Hearing. The Court therefore has no factual basis on which to order that the Trustee pay any amounts to Mr. Grimm as requested in the Business Management Motion.

Hearing give the Court concern that the Trustee's and Mr. Grimm's cooperation with each other

has been less than optimal for the efficient administration of the Debtor's estate, the Court will

issue an Order directing both the Trustee and Mr. Grimm to take or refrain from taking certain

actions the Court believes is necessary to move the estate toward a more productive and efficient

liquidation for the benefit of creditors.

      An Order consistent with this Memorandum will be entered.


Dated:  January 26, 2021

                      MAGDELINE D. COLEMAN
                      CHIEF U.S. BANKRUPTCY JUDGE

James W. Adelman, Esquire
Robert M. Morris, Esquire
Morris & Adelman PC
201 N. Presidential Blvd Suite 100
P.O. Box 2235
Bala Cynwyd, PA 19004-6235

Erik B. Jensen, Esquire
Jensen Bagnato, PC
1500 Walnut Street, Suite 1920
Philadelphia, PA 19102

Joshua L. Thomas, Esquire
Joshua L. Thomas & Associates
1110 Pocopson Road
P.O. Box 415
Pocopson, PA 19366

Gary R. Grimm
Grimm Brothers Realty Co.
837 Swede Street
Norristown, PA 19401

Terry P. Dershaw, Esquire
Dershaw Law Offices
P.O. Box 556
Warminster, PA 18974-0632

Jeffrey Kurtzman, Esquire
Kurtzman Steady, LLC
401 S. 2nd Street, Suite 200
Philadelphia, PA 19147

Kevin P. Callahan, Esquire
United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107